and we'll hear from Ms. Bradley first. Thank you, Your Honor. May it please the Court, my name is Suzanne Bradley and I represent Deputy Ingle. My partner, Frank Ford, represents Deputy Sutton. I will use 10 minutes of the 20-minute argument, reserving two for rebuttal. Mr. Ford, I believe, is going to use six minutes for his main argument and two for rebuttal. Your Honor, I want to start today by saying— Let me ask, Margaret, are you picking this up? She's not at the mic. I know you have your notes there. We want you to be able to make your presentation, but you need to be speaking into the mic. Just speak into the mic. We can— All right. Thank you, Your Honor. Move the mic. And if you can't hear me, please tell me. Now we can hear you fine.  I'll just move it over to the podium where you— The recording that I'm worried about. We record these arguments. All right. The facts of this case are extraordinary. It's a qualified immunity case. The lower court denied summary judgment and refused to grant qualified immunity. Earlier this morning, I had the clerk present to the court a series of photographs from the record from the bar's videotape. Briefly, this is a case about a man who had too much to drink, was told to leave, refused to leave, and Deputy Engle came to escort him out of the bar. The first thing Mr. Norman does, and you see this on Deputy Engle's body-worn camera, is he reaches for my client's left side. My client is left-handed, and this is where his gun is. And you see my client slap away Mr. Norman's hand. He turns him around by the shirt and walks him out of the bar and tells him to go home. That's the first time Mr. Norman is told to go home, and my client, Deputy Engle, tries to disengage from Mr. Norman. Mr. Norman's response to that is to say, are you going to head-bump me? That's a record sight of 538 in Engle's body-worn camera. Then Norman adds in quick succession, do you have a short man complex? I see. You get me. I get you. That's at the body-worn camera sight ROA at second 50 through 53. These remarks are in direct contradiction to what the lower court found. And when you read the lower court's opinion, it appears, at least to me, that the judge is using a motion-to-dismiss standard rather than a summary judgment standard. What's critical in this case are the videos under the Scott case. And your honors know that when there's a dispute about the facts, you can rely on the videotape and what it says. So, I'm going to turn to these pictures, and the very first one shows Mr. Norman backing up and coming at my client. Now, Mr. Norman disputes that he ever hit my client, Deputy Engle. You see, in the third picture in the series, Mr. Norman tackles my client. Mr. Norman throws his arm around the deputy's neck and starts to punch the deputy. That's all in your brief. We don't need photos about that. All right. Well, your honor, why that's important and why I talk to it is that this is not mentioned in the court's lower court opinion. And when you analyze qualified immunity, you know that it's the constitutional, whether it's a constitutional violation and whether there is a clear consensus of cases. And Mr. Norman, the cases that he relies upon in his brief, and it's his burden to disprove qualified immunity, in Joseph, for example, Mr. Joseph was not suspected of a crime. One officer punched him, tased him 26 times and tased him twice, and that man died. That is not this case. This is a drunk and erratic man that attacked officers who tried to get him to go home, and they tried to disengage with him. The Ramirez case, that man was tased and handcuffed. The DeVille case, the officers broke the window and pulled the person out of the car. The Newman case, that man was tased 16 times over a traffic stop. The Goodson case that is cited is not precedential. And there are no cases that I could find where officers tried seven times to walk away from a drunk, belligerent man who was told to go home. The closest case that I found is the Griggs case, and that's at my brief at page 9, document 40. What's your point? My point is this is, the judge should have given us qualified immunity and he should have given a summary judgment. Well, if you look at it, I mean, I think the best argument for Mr. Norman is that when they finally had him down on the ground, it looked as if Ingalls started punching him. They got him on the ground, well, again, if you look at these pictures, Your Honor, which is why I put it, when they finally get control of Mr. Norman, it takes three officers to control Mr. Norman. And this entire event occurs in just a few seconds. They get him to the ground, and the punching is only five seconds long. That entire time, Mr. Norman is struggling. Now, just to back up a little bit. He did have fractures to nasal bones, orbital rim, and maxilla. Yes, Your Honor, he had injuries. Just because there are injuries did not mean it's excessive force. I mean, people can be shot, and that can be seen as excessive force, but not a constitutional violation. So that's the point, Your Honor. Counsel, would you agree that the videos show that the plaintiff's arms were pinned, both arms, when your client was hitting him? Is that what the videos show? I'm not saying that makes your client exempt from qualified immunity. I'm just asking, is that what the evidence is? I don't recall that, Your Honor. I'm not saying that's wrong, but I don't recall that. I remember my officer on top of him, punching him twice with one hand and three times with the other, and he still wasn't handcuffed. It's only when he turns his head and says, are you done? And plaintiff casts that as him choking him. There's no evidence of any choking injuries on Mr. Norman. He gets up, my client leaves to go wash the blood off, and that's when he's handcuffed. And it takes a minute to cuff Mr. Norman. He's still resisting. The officers have a right to control the suspect, and they have a right to protect themselves. And I would say from the very beginning, when they started walking Mr. Norman out of that bar, he was trouble. And it only accelerated. First it was nasty comments to the officers, they walked away. Then he physically came up behind Mr. Sutton, Deputy Sutton, and Deputy Sutton is much bigger than Mr. Norman, and Deputy Sutton turns around and just pushes his shoulders back and says, don't come up behind me. Officers never want people to come up behind me. That particular deputy, Deputy Sutton, had to do that twice. Norman still came at him. And the very last part of this video, you see my client turns Sutton around and they're walking back into the bar, and Norman runs at them. He runs at them, he grabs my client, he punches him, he's dragging him toward the parking lot. They get him on the ground. They punch him, he's injured, but it wasn't until then that they had control of him. And that's the difference. That's the difference in these cases and the cases that they cite to, the tasing cases. It's whether or not this is excessive force. Now in the qualified immunity analysis, your honors know that something can be determined to be excessive force, but qualified immunity still applies because there isn't a clear consensus of cases. And the best case for us is the Griggs case, which is at 841 Fed Third, 308, and the Penn site is 314 to 315. And I want to just conclude by reading what this court said, Brewer's actions may not have been as restrained as we would like to expect from model police conduct, but qualified immunity protects officers from the sometimes hazy border between excessive and acceptable force. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second decisions and judgments in circumstances that are tense, uncertain, and rapidly evolving. Thank you. You have a chance for rebuttal. Okay. Thank you, Your Honor. Give me one minute to clean up.  Okay, Mr. Ford. Good morning. Morning. My name is Frank Ford. I'm representing Deputy Sutton. May it please the Court. As my co-counsel pointed out, we're here today on the denial of a motion for summary judgment for qualified immunity. The main claim against my client is a bystander claim. Now, when you read through the court's order, you will see that the court does no analysis of Deputy Sutton's actions, essentially. Most of the things the court points to are what Deputy Engle did. The court does not analyze the fact that—in fact, the court comments that Norman disputes that he assaulted Engle, even though that's clearly on the video. But the court does not analyze the time factor here. This whole event took 18 seconds. Okay? What? No, wait. From— From the time Engle attacked—from the time Norman attacked Engle until the time Engle gets off Norman is 18 seconds. Okay. Seven of those seconds, you'll watch on the video, Engle and Norman are struggling on their feet. So now you're down to 11 seconds. They get on—they fall to the ground, Norman—or, Engle punches Norman five times in six seconds. He then puts his hand on his throat for four seconds, and he puts his hand on his face for one second. So essentially, the injury-causing event here are the punches to the face. I mean, that's what the medical records bear out. They provide zero evidence of any other injuries. So essentially, what the plaintiff is arguing is that Deputy Sutton, in six seconds, should have recognized Engle's using force, the plaintiff quit struggling, Engle kept using force, and then Sutton should have intervened. In six seconds, all of those things have to occur. One of the things on the video, the audio that comes with it, is your client saying something like, Papa, encouraging Engle to hit him again, is how that could be interpreted. This is a summary judgment. What do you say to that? Well, what I say to that is, this was in the middle of a struggle, chaotic situation. They're still fighting on the ground. Well, we're looking at the possibility of bystander liability. You say there's no possibility, but nonetheless, that's a legal issue. So if there was any, you say he didn't have time to react and to maybe stop Engle from doing something he shouldn't have, whether that's true or not, that is a word that would encourage him to continue if Engle was doing something improper, which to me, I don't know what that does to bystander liability, but it seems to be headed that way. I understand what you're saying, Your Honor, but as I recall the video, he said, Pop him before he punched him the first time. And I don't think- I'm not sure that helps. Well, but they're struggling. They're still struggling on the ground. But doesn't the video show Norman's arms pinned? I don't see that on the video, where he's being punched with his arms pinned. And in addition, his legs weren't pinned for sure, and you can resist with your legs. But Sutton, he does say, Pop him. He doesn't say, Pop him and break his face. He doesn't say, Pop him and use excessive force. He's telling them, neutralize this threat. That's what he's telling them, which they clearly have the right to do. And this all occurred so quickly, there's nothing Sutton could have really done to stop it. But the main issue that I have with the court's order is, they don't analyze what Sutton did. The court never says, Sutton did X, Y, and Z, and that is why he's not entitled to qualified immunity. Well, the court says something about, I can't tell if he got reasonable medical treatment. That is correct, Your Honor. First of all, I would say on the video, they called EMS within 2 minutes and 30 seconds of the start of the altercation. I don't know how much quicker you can get. Second, plaintiff has zero evidence of any injury resulting from the denial of medical care. And so where the court's flaw in its analysis is, well, maybe I think there was delayed medical care, however, you have to go to the next step and say, but was the plaintiff injured by the denied or delayed medical care? And there's zero evidence of that. And so my client is entitled to qualified immunity based on the fact, and I did a string cite in my brief of the multiple, multiple cases. I could not find any case that was directly on point that's authoritative, but there are several cases throughout the country where the courts have held, you must have an opportunity to intervene to have bystander liability. And so, for example, in Cheney v. Young out of the Sixth Circuit, 98F4699, knee strikes that lasted no more than 10 seconds could not lead to bystander liability. L v. City of Pittsburgh, the Third Circuit, 975F3327, the other officer used a stun gun for five seconds. Are those in your brief? They are. Then there's another case, Adkin v. San Diego, Southern District of California, a stun gun used for a matter of seconds. The upshot is, is if you look at all these cases, what the courts are saying is, if it happens in a few seconds, there's no bystander liability because no human can react that fast. So, Deputy Sutton, his brain is not a supercomputer. He can't analyze data and process data like an artificial intelligence, and he's not a superhero. He doesn't have superhuman speed. So again, in six seconds, he had to recognize the threat or see the use of force, recognize that Mr. Norman quit struggling, recognize that Engle is continuing to use force inappropriately, and then stop it. In six seconds. I see my time is up. All right. Thank you. Mr. Johnson. All right. Good morning, Your Honors, and may it please the Court. Mr. Norman has three main points on appeal, but first I'd like to address a couple of small things from opposing counsel's respective arguments. The first two are things that, Your Honor, Judge Southwick, you pointed out. First is that the video does show that Mr. Engle, or Deputy Engle, excuse me, was on top of Mr. Norman and had him pinned and... Looks like he was about a foot shorter, too. Yes. Yeah, and... Which is how Norman got him in a headlock. The headlock claim, which... It's not a claim. It's right there, visible on... And yet Judge Hoyt doesn't even bother to mention it, and our Court was recently overturned by the U.S. Supreme Court for not considering the whole panoply of events. So a couple of points there, Your Honor. First with respect to the, I have it right here, the Barnes v. Felix case that you're referring to. So that case is distinguishable for a few reasons. First, it involved deadly force, and secondly, it involved a specific doctrine with respect to deadly force incidences that only limited the time that was analyzed to two seconds before, which is not... I didn't say... I didn't say it well, except for the fact that you always consider the facts uncircum... And I agree with the other side, I don't know about my colleagues, but this is an 18-second event in toto that we have to consider, and the judge didn't say a word about that. And frankly, you lose credibility with the Court when you do not acknowledge that your client was the aggressor to begin with. Your Honor, I... Again, so we can and should, and I will get into those specific facts, but I think that that speaks to Appelli's first overall main point, which is that because this is an inherently fact-based decision by the lower court, that this Court lacks jurisdiction over the appeal. The Supreme Court made clear in Ortiz that, quote, instant appeal is not available when the district court determines that factual issues genuinely in dispute preclude summary adjudication. Well, counsel, I don't find any fact-based issues there. What I see from this film, look at it, is a young man who was, quote, drunk, but he wasn't very drunk at all. This time, within those three seconds, what you're admitting is, and I saw it clearly in the film, that after all of this smart-alecky talk about short stuff, and let me get all your names and so on and so forth, being provocative as he could be, police officers did not respond to that. They responded only to him. And with that short speech second, what you're reading out is that your client had a closed fist, and it's very, very clear, and he flung with all he could to try to hit this guy in the face. And they went down in those three seconds. It was in that short period of time that he got hit back. Now, if police officers, there's a limit to, I just don't see those, I just don't see your version of the facts at all. I don't, can't expect an officer not to respond to that, but yes, he got hit in the face, but it was only because it, within three seconds, the guy came back, and the officer had punched him there, and in a very short period of time. He wasn't able to hit him on the ground and beat him. It all happened that quickly. But it was a response to a continuation of this guy's not only resisting, but resisting with force. And as my colleague pointed out, I mean, a bear hug at the time, and a short man, what was he to do? Just sit there and, I just don't see it in this film. So yeah, Your Honor, I think that again speaks to the kind of overarching procedural issue, which is the jurisdiction, which is we're talking about these very inherently factual questions. Well, frankly, it does not, I mean, you know, Judge Hoyt is a very good man, but it doesn't, there's a strong disconnect between the very brief opinion that he writes and what is visible on the video. And Scott V. Harris says we can rely on videos. Correct. So we can rely on videos. But so just to finish the point, because it is relevant to answering this question about Ortiz versus Jordan, the district court three, four times mentioned factual disputes. And that jurisdictional question is resolved based on what the district court determines, not how the case is argued. So arguing, you know, so the court has to have jurisdiction first before then turning to saying the video completely discredits, or the video only has one side of the events. The court determined that a video, or a reasonable jury, and I think that this is correct, a reasonable jury, could view the video and find that by the time Mr. Norman was on the other side disputed choking, but you can physically see, you can visibly see Mr. Ingle's hand on Mr. Norman's neck for an appreciable period of time. Now with respect to the lead up, we don't, Mr. Norman doesn't dispute, you know, the swing that occurred. You know, we talk about that in the brief. The swing that occurred, so what happened, and this begins before the screenshots that opposing counsel provided, so opposing counsel's screenshots start at the, you know, the beginning of the wind up. What happened there was he had gone up to the officers as they were going into the restaurant, Ingle shoves him backwards, and while he's still stumbling backwards, continues toward him. And then in response to that, winds up, and there is clearly, excuse me, a swinging motion that kind of glances off the back of Mr. Ingle's neck. Beyond that, there is, the video does not show, and the screenshots point to this, the screenshots point to this exact fact, that that video does not show, because their backs are both turned to the camera, does not show any further punches from Mr. Norman at Mr. Ingle. Your problem is the time lapse. Right. So. You spread these vents out, and that completely changes the story. You can't expect a police officer to do anything to me than what happened here. When I saw the film, there is simply not a disconnect where he stopped and pushed him out. It was all part of the same response to it, as they went down, and he was in a headlock. So, yeah, and turning to the discussion of that headlock and the timing issue, we're talking about roughly 18 seconds, you know, we've all seen the video, there's no use, you know, so, the only, the screenshots show, and the screenshots slow it down considerably, like you're saying, stringing it out, very frame by frame, and the screenshots show also the time stamp. So the frame by frame goes from 22, 28, 39 to the beginning of the 22, 28, 41 seconds. So that itself, that initiation of the struggle is a two second span, and the frames that show time stamp 22, 28, 39, those first few frames show where Mr. Norman is reaching around Mr. Ingle. But by the next second, 22, 28, 40, they're wrapped around each other. If they're wrapped around each other, that's not a headlock, that's a headlock, the person engaged in the headlock. That's how you get out of a headlock, isn't it? I don't... That's a defensive move, isn't it? What do you mean, to grab the other person around? Yeah. Right. So it happened in a fraction of a second. So I mean, this notion of a headlock, simply even breaking it down based on the screenshots that opposing counsel provided. Did you have oral argument before Judge Hoyt? Your Honor, I don't believe this was argued orally. We certainly don't have a transcript in the record that I'm aware of. I'm wondering. So in that first couple of the 18 seconds, there is a moment of, literally based on these screenshots, a split second of a possible headlock that was then immediately broken. And then toward the end of that period, yeah, it's a short amount of time, but we're talking about first second, fraction of a second, up to two seconds at most. And what is your, aside from the cases that they've already distinguished, what's your best case? So two responses to that. First is, I believe that Joseph is not distinguished. I think Joseph is one of the better cases because, like in this case, a lot of the force analyzed was after officers already had Mr. Joseph pinned to the ground in the same way that Evan was pinned to the ground. So a lot of that force occurred that, you know, they had a measure of control over him and decided to continue using force instead of restraining, which is exactly at issue here. You know, what we're saying is that the force was in excess to the need and we have to look at the need. What was the need? It was restraint. And the punches to Evan's face and the choking that occurred could only happen after he was restrained enough that he couldn't defend himself from those punches and that choking. So by definition, those punches and that choking were excessive to the need. And you can hear that too in the audio. What Mr. Ingle says is, you done, you done, you done, and this is a quote. I'm not going to use the expletives. You done, you done, you done, MF-er, you going to hit me, another expletive. This wasn't somebody that was continuing to struggle, gaining control of the situation. This was somebody that was now doling out punishment for what had occurred before rather than continuing to assert control. And with respect to what had happened before, there's, you know, discussion about insults that happened in the bar, but again, that's not ultimately material to justifying five punches to Mr. Norman's face, which the number of punches, five punches, is not disputed. Is the five punches all while he's on the ground? Yes, Your Honor. Is that what you're counting, starting when he's on the ground? Yes. So his arms interview pin during all five punches? In our brief, yeah, we identified, we kind of separated out into three separate uses of force, and that kind of goes back to one thing Mr. Ford was saying about the medical records. So the medical records don't differentiate between individualized uses of force like the briefs do. It's just the injuries from the incident. The three kind of, to the extent they're discreet, uses of force that we're trying, that we're identifying are, Sutton throws a jab while Mr. Engel's on the way down. There's the five punches to the face, and then a beat, and then the choking. And when I say beat, I mean a beat of time, not, just because that could be a little bit So what we're saying is, obviously those five punches and the choking are the most egregious aspects of that. But to further answer your question, Judge Jones, about qualified immunity, what the district court did, and had legal grounding to do, was to look at the events that transpired and the egregiousness of the events that transpired, and say that there's not necessarily a specific case requirement in terms of a high degree of Well, if every time an officer was detaining an aggressive suspect and incidentally injured the suspect, if every time that case had to go to the jury, then there would be no qualified immunity. Right, Your Honor. So there can be punches that do not result in a denial of qualified immunity. I don't know that I necessarily agree with that statement. I think I can agree with the first part, that any incidental injury in any use of force does not necessarily overcome qualified immunity. Like you said, otherwise qualified immunity would cease to exist. But to say that, therefore, any amount of punching, however intentional, however excessive, can never overcome qualified immunity, I think is what the court, that's what this court carved out in Cooper v. Brown, where it said that we can look at the excessive force factors themselves, and we can look at that use of force to determine whether or not qualified I thought I saw something out of the side of my eye that was Mr. Norman indicted for anything? I don't recall that he was indicted for . . . because I don't recall that he was indicted. Well, I'm not sure whether I saw it in the district court or where. Yeah. But, Your Honor, just turning back to the district court briefly . . .  He was charged with a felony that was not resolved for twenty-one months. Right. Yeah. I knew that there was a longer term proceeding with that, but I wasn't sure on the outcome. But yet, you know, with respect to the opinion itself, Ms. Bradley mentioned that, you know, it seems almost as if it's a motion to dismiss standard, but by its own terms, it's . . . it knows, you know, the court knows what it's doing. It knows that it's evaluating a motion for summary judgment. ROA 985 is the standard of review for summary judgment, and ROA 996, which is exclusive to summary judgment as opposed to motion to dismiss, outline numerous factual disputes that, again, go back to the jurisdictional question that would . . . This is not our first rodeo, so what do you have to say that we need to hear that we don't already know? And I'm not trying to be rude, I'm just saying this is an eighteen-second encounter. It doesn't necessarily take that much time for us to consider. So, Your Honor, I mean, I think we've gone over a lot of the main stuff that Apelli is arguing, which is, first of all, that, yeah, it's an eighteen-second encounter. It's a short amount of time. And the video shows a lot, but it doesn't show everything. There are factual disputes over the video, over interpretations of the video, and over minutia that can and should, at this stage, be resolved by a jury instead of by this court. I think that's kind of the main thrust, and I think that the second part of it is, you know, eighteen seconds is not a long amount of time, but it's long enough to know that by the time you're on top of somebody that you don't necessarily need to wail on them until they're limp. Even when you're a foot smaller? His angle's relative size, I think, is negated entirely by several things. First, he had two other officers backing him up that were there, you know, in frame almost the entire time. You know, within less than a second, they're in frame and they're there helping him. And they have armor training and sobriety, none of which Mr. Norman has. You know, Mr. Norman was stumbling around before that. They had pushed him around a little bit. They had seen that he was stumbling and not fully stable, and, you know, they could see how he was dressed. They'd interacted with him for long enough before to appreciate that if, you know, he had any kind of weapon, you know, he hadn't produced it and was not intending to use it, and that, you know, is not something that they ever claimed, that they were worried about a weapon. So I think when we look at, you know, the factors... Look, what do you have to tell us now that we haven't, that we don't know? I, yeah, like I said, I believe we've covered almost everything. I think the last point that I haven't stated yet, and I don't think I made it as clear in the brief as I maybe wanted to, was when we do look at the factors, one of the main ones is the safety of people around. And yeah, there was aggression between Mr. Norman and the officers. But there is no evidence that there was a safety threat to anybody beyond that altercation. And there isn't anything in the video, yeah, in the video or otherwise that the officers were ever at risk of losing control of Mr. Norman to a significant degree. You know, once they asserted their superior numbers, training, and sobriety over him, there was no question that they were able to and did get him under control. So with that, thank you for hearing us, and we ask that you either dismiss or affirm the disreport. All right. Thank you, Your Honors. All right. Ms. Bradley, Mr. Ford, I'm equal, I'm trying to be fair to both sides here. You have to tell us something that we don't already know in rebuttal. Your Honor, I'm just going to ask the Court to reverse and render for both deputies, and if I have any time left in rebuttal, I'm going to hand it over to Mr. Ford. Okay. Thank you. Thank you. I just have a couple of points in rebuttal. First of all, this is a qualified immunity case. It's plaintiff's burden to defeat qualified immunity. And he just admitted that the medical records don't show any injury from the delayed medical care. That's his burden. Second, in this case, the Court did exactly what Scott B. Harris prohibits. The Court ignored what was on the video and said, the plaintiff says what I see on the video isn't on there, so there's a fact question. You know, this is – Scott B. Harris is directly on point on this. The other point I'd like to make is that the plaintiff is essentially asking you to engage in 20-20 hindsight. He wants you to look at it frame by frame and go, oh, well, you didn't have to punch him the third time or the fourth time, completely ignoring a chaotic situation with a belligerent person who's intoxicated, and they had seconds to react. And I reiterate the request to reverse and render. There's nothing more to be developed at the trial court. All the evidence is there. Okay. Thank you. Appreciate it. We'll take a quick break.